In the Matter of JAMES T. BUNT, an Attorney, Respondent.

First Department, May 28, 1920.

**Attorney at law disbarred — forging decree of court.**

Attorney at law disbarred for forging and delivering to his client who had brought a suit for separation against his wife a decree of the court purporting to grant an absolute divorce to said wife based on a counterclaim for such relief interposed by her in the action.

DISCIPLINARY proceedings instituted by the Association of the Bar of the City of New York.

*Einar Chrystie,* for the petitioner.

*Stuart M. Kohn,* for the respondent.

CLARKE, P. J.:

The respondent was admitted to practice at a term of the Appellate Division, First Department, in December, 1908. It is alleged in the petition that he has been guilty of misconduct as an attorney at law as follows:

In January, 1916, one James W. Brodbelt retained the respondent as his attorney in a separation action brought against his wife, Leila L. Brodbelt. The respondent commenced such action in the Supreme Court, New York county, and the defendant therein appeared and filed an answer containing a counterclaim praying for an absolute divorce. The case was placed on the calendar of the court but has never been brought to trial. On or about May 4, 1916, the respondent prepared and delivered to his client, James W. Brodbelt, a paper purporting to be a certified copy of an interlocutory decree of absolute divorce entered and filed in the office of the clerk of New York county in the said action of *Brodbelt* v. *Brodbelt.* This paper was prepared by the respondent and delivered by him to his client for the purpose of enabling the client to induce persons to whom he might exhibit the same to believe that an interlocutory decree of divorce had in fact been made and entered in said action of *Brodbelt* v. *Brodbelt.*

The paper is properly backed with an indorsement typewritten thereon in due form:

"NEW YORK SUPREME COURT
COUNTY OF NEW YORK

---

"JAMES W. BRODBELT,
Plaintiff,

*vs.*

"LEILA L. BRODBELT,
Defendant.

---

"INTERLOCUTORY DECREE."

It is typewritten and at the bottom of the first page on the side bears written initials " M P H " and at its end upon the side the same written initials and concludes with the typewritten words: " Enter, M. L. E. J. S. C." and the handwritten words:

" WM. F. SCHNEIDER, *Clerk*

" A copy ·

"WILLIAM F. SCHNEIDER, *Clerk.*"

It has all the indicia of a duly certified copy of a duly entered decree. It bears the heading: " At a Special Term, Part IV of the Supreme Court, held in and for the County of New York, on the 4th day of May, 1916. Present: Hon. Mitchell L. Erlanger, Justice."

It states, after recitals of the appearances and pleadings, as follows: " And the plaintiff having made default in pleading to said counterclaim and said cause having been duly placed on the calendar of this court and duly coming on to be heard before the court on the 4th day of May, 1915, and the plaintiff having appeared by James T. Bunt, his attorney, and the defendant having appeared in person and by Welton C. Percy, Esq., her counsel, and the proofs and testimony on the part of the defendant having been heard, and the testimony having been reduced to writing and due deliberation having been had thereon, and a decision having been made containing findings of fact and conclusions of law, directing judgment accordingly.

" Now on motion of Welton C. Percy, attorney for defendant, it is

" Ordered, adjudged and decreed that the defendant is entitled to judgment to be entered as hereinafter provided:

" *First.* Dissolving the bonds of matrimony heretofore exist-ting between plaintiff and defendant because of the adultery of the plaintiff, and freeing the defendant from the obligations thereof and permitting the defendant to re-marry, but forbidding the plaintiff to re-marry any other person during the life time of the defendant, except by express permission of the court."

Followed by the ordinary provisions of an interlocutory decree of divorce.

The respondent admits that he himself typewrote the paper and placed the written initials and alleged signature thereon, and that his purpose was to simulate a certified copy of an interlocutory decree duly entered. . The questions of fact litigated before the learned official referee, to whom the proceeding was referred, were, *first,* how and why the document was manufactured, and *second,* how it came in the possession of the complaining witness, James W. Brodbelt.

The case of *Brodbelt* v. *Brodbelt* appeared upon the court calendar on April 28, 1916. It was then adjourned until May 3, 1916, when it appeared at the foot of the calendar called the waiting list, from which cases were to be taken for the regular day calendar as required. The case remained on the waiting list until May 15, 1916, when it was again adjourned. It has never been tried and no decree has ever been entered thereon.

Brodbelt testified that he employed the respondent to bring an action against his wife for separation and paid him $150, $100 of which was to be paid to the attorney for his wife, and that his wife interposed an answer with a counterclaim for an absolute divorce; that on May 5, 1916, respondent gave Exhibit 5, the decree in question, to him on a Broadway car and said, " Put it away and forget it and don't talk about it." He further testified that respondent told how his wife was dressed and how she looked on the witness stand; that he had overheard her say to Mr. Percy that she was very glad it was all over and that the judge had signified that he only would hear one witness, that other witnesses were not necessary; that he discovered that this was not a genuine certified copy of a divorce decree either in July or September, 1916; that he went to the county clerk's office and asked for the envelope containing his case. He did not find any certified or any original copy of this decree; that he called respondent over the telephone the same day and asked him what he meant by handing him a bogus decree and that respondent replied, " You have been talking again," and that he replied, " No, I have been investigating;" that they arranged to meet at the county clerk's office the next morning and at that interview respondent told him to keep quiet; that a clerk across the street in the Hall of Records had his decree under

private lock and key as a friend of his so there would be no
newspaper notoriety; that respondent then took him across
the street to the Hall of Records building to the bureau of
naturalization; that witness became very much excited and
asked by what right respondent took him to that department.
Respondent stated he was a friend of his on a two weeks' vaca-
tion and would witness please wait until his friend returned so
that he could prove that this clerk had kept this paper under
cover; that witness told him he would not wait but to go
with him to the seventh floor where Mr. Halpin was, whom
he had called on the day before; that witness said, " Mr.
Halpin this is the man who I spoke to you about yesterday,
claimed to be your friend."   Mr. Halpin looked at respondent
and said he did not know him, had never seen him before to
his knowledge, then looked at the paper, and said he did not
initial it.   Witness asked him how he could answer so quickly
and he said because he did not initial any papers in this depart-
ment after 1910, this paper being dated 1916; that respondent
and witness then went back to the county clerk's office and
that a clerk there got out the papers pertaining to that court,
turned to the index file and showed where his case had been
adjourned until October; that respondent and witness then
went to Mr. Percy's office, 32 Nassau street, the same day;
that he showed this paper, the forged decree, to Mr. Percy
who looked at it and asked respondent what it meant.   He
did not reply; that respondent and witness quarreled and
witness called him a liar; that they then came down to the
sidewalk in front of Mr. Percy's office, whereupon respondent
said to witness that he prepared and forged this decree of
divorce; that respondent asked witness what he was going
to do about it, pleading on the ground of his wife and children
not to do anything; that he told respondent that he would
be back at his office at two o'clock to receive the money he
had paid him; that after an interview with Mr. Duross,
who was respondent's employer who told respondent to pay
back to him the money he had received from him, he did
receive the amount, namely, $150, the next day.

Mr. Percy testified that the respondent came to his office
with Brodbelt and introduced Brodbelt to him and that
Brodbelt took a paper, Exhibit 5, out of his pocket, put it

down in front of him and asked what it was; that he looked at it and turned to respondent and asked him, "What is this?" and he replied, "I can see what it is," and then respondent and Brodbelt had a very wordy altercation in respect to this paper. Mr. Percy further testified: "The best of my recollection is that Bunt said in substance that the paper had been prepared because Brodbelt had been continually annoying him by questions in respect as to when this case was to be tried and disposed of and that he, Mr. Bunt, knowing that the case could get tried before the summer vacation had prepared this paper to keep Mr. Brodbelt quiet in the meantime. He had no intention of giving it to Brodbelt or letting it go out of his possession, but he had thought by this means to keep Mr. Brodbelt quiet."

Mr. Duross testified to the interview in his office when the respondent paid back the $150 to Mr. Brodbelt.

The respondent himself corroborated the complaining witness's testimony as to the making of an appointment over the telephone to meet him at the naturalization office, then going with him to Mr. Halpin, the interview with him and Mr. Percy, the interview with Mr. Duross, and the paying back of the $150 to him, although contradicting him as to details.

The respondent testified that he prepared Exhibit 5 in his office and that Brodbelt was present. "He came in to see me; his case was on the calendar; he knew it was on the calendar and published. He came in to see me and asked me 'what is next' and I told him that in view of the fact that we were in default, Mr. Percy proceeded and took judgment by default. And then he said 'what happens then?' I stated that after judgment by default he has to order the stenographer's minutes and prepare findings and prepare a judgment; he is allowed about ten days to do that. He said, 'Supposing now they did appear in court and she does not go any further?' 'Well,' I stated, 'I am attorney of record. I suppose I can prepare a proposed finding and proposed judgment. All you are interested in is the question of alimony. You want a judgment with no alimony.' I said, 'I will prepare a proposed judgment. I have that right as an attorney, and I will take it up with Mr. Percy, and probably

he will agree to it, and he will use my proposed judgment.'
And he said, well, he didn't think that was a bad idea.  I
said, ' In case she does not move after the trial to have the
stenographer's minutes to prepare the finding and a judgment,
why, I would have to get them in order to put the matter in
the form of a finding and judgment;' and he had no objection
to that.   So then he got curious as to whether it would be
in a printed form or in a typewritten form, and I said, ' Well
most of these cases are by printed form, where it is by default,
but your case is a little different,— your's is not a default
of the defendant in printed form furnished by the clerk;
this will be a judgment on a counterclaim by a defendant and
it will have to be different, with a lot of different recitals;'
and I said ' That is the thing that you will have to get right,
and in this case it will have to be typewritten by one of the
attorneys.'  I said, ' Mr. Percy is a very decent fellow;  I
can talk to him; I can prepare one and take it over to him.'
So I started in a draft of the form of judgment, and I went
to my files and got out a judgment I had in the *Paulus* case,
where the man prevailed, and then I went into Mr. Duross's
file to get a form of judgment when a woman prevailed in the
action, so I would get the proper recitals and the proper form
of recitals and the proper form of judgment.  And I took
these different forms of judgments of Mr. Duross's client and
my own, and I drafted a proposed judgment as near as I
could to what would transpire by Mr. Percy and his
witnesses, and so forth, on a default; and then it was my
idea to take it over to Mr. Percy and see if we could not
agree on the proposed form.  Now, Justice PAGE, I believe
was sitting in Part 3, and Justice ERLANGER in Part 4, and
on these matrimonial cases they were sending in con-
siderable to Judge ERLANGER, and I said, ' Your case will
probably go in there, because he is handling these matters;'
the other part was handling equity cases, and was filled up,
calendar part and I believe the other parts were filled up, so
Judge ERLANGER was taking the cases; and I said, ' He will
probably be your Judge; but it doesn't make any difference
what we put in this form, Mr. Percy will change it in the form
to conform to the necessary recitals; but we are particularly
interested in the recital leaving out alimony.  That is all we

are interested in.' " As a matter of fact no default had then occurred, the case was not on the day calendar, Justice PAGE was not sitting in Part 3 nor was Justice ERLANGER sitting in Part 4. The evidence proceeds: " Q. Mr. Bunt did Mr. Brodbelt ask you to prepare a decree of divorce? A. Well, not in so many words. He asked me what it was like, and what the recitals would be, &c., and wanted to see some others I had there, and instead of showing him them I said, ' Well, I am attorney in this case; I suppose I can prepare a proposed decree and take it over to Mr. Percy and get his approval on it,' and without any hesitancy I sat down to the typewriting machine and started off a proposed decree as a sample to show him, and also so as to have the necessary recitals to make sure that the question of alimony was omitted, and something that would meet with the approval of Mr. Percy as to form. Q. Did you then prepare petitioner's Exhibit 5? A. That was then prepared. He sat there while I ran it off on the machine. Q. Did Mr. Brodbelt say what he wanted with this paper? A. Not at that time. The way the question came up of what he wanted it for, one of the papers I had in the *Paulus* case was certified and I spoke about it. I said, ' This one is not important, and when you get your final, that you get certified to show to the Marriage License Clerk.' He said, ' What do you mean by certified? ' ' Why,' I said, ' the clerk puts on it, ' William F. Schneider, Clerk,' yes, ' William F. Schneider, Clerk' and he sat there, sort of curious about the matter, and I said, ' Yes, it has written on ' William F. Schneider, Clerk ' and then a seal is put on it ' and then he got so curious about the question of what certification was that I picked up a pen, and I am a very fair penman, and this other one was laying there, and I said, ' William F. Schneider Clerk,' and I wrote it out like that (indicating). Now, that is about the same thing as is on there. Q. Did he ask you to do that? A. He didn't ask me to put ' William F. Schneider, Clerk; ' he asked me what certification was, and what it looked like certified, and I wrote it like the certification clerk. After I prepared it, it was lying before me on the desk, and we continued talking * * * when he got up ready to leave he picks up the paper and he started to fold it up, and he had it just about like this in his pocket (indicating), and

I said, ' Where are you going with that?' And he said ' I want to show it to Billie.' I said ' Oh no. No. Let's have that thing. I want that paper back.' And he said, ' Oh, forget about it. What's the matter with you? Don't cry over the thing. I will bring it down to you tomorrow.' He folded it up and put it in his pocket. That was very late in the afternoon about four o'clock."

The respondent contradicts the complaining witness as to the time at which he was with him at Mr. Percy's office and in certain details of his testimony. He also testified that upon the night that, as he says, Brodbelt took the paper from his desk, he went to his house to recover it but did not succeed in getting it, and he offers some other testimony in support of this claim. So that as to certain features there were questions of fact presented; but it is beyond controversy, conceded by the respondent, that being the attorney of record of a party to a divorce action, which had not been tried, he prepared a paper which simulates in every detail a regular certified copy of an interlocutory decree of divorce and that that paper was in the possession of his client; that subsequently that client accused him of having delivered to him a faked decree and demanded back the money which he paid him and that after taking the advice of his employer he had paid back that sum. His explanation of how and why this simulated certified copy of an interlocutory decree came to be prepared by him is incredible. The exhibit itself is convincing refutation of respondent's confused story of its manufacture, first, that it was prepared as a proposed decree to be submitted to the other side, and then that it was prepared to satisfy his client's curiosity. It is a complete paper backed with a cover, fully indorsed, labeled " Interlocutory Decree," and the sheets fastened by eyelets.

Upon a careful consideration of the whole case, we agree with the conclusion of the learned official referee who reported: " I am of the opinion that the bogus decree was prepared by the respondent and delivered to Brodbelt that it might be proof of an interlocutory judgment and that Brodbelt was cognizant of this purpose. I find the respondent guilty of misconduct as an attorney at law as charged in the petition."

The respondent was not inexperienced, having been eight

years at the bar at the time of this transaction.    His confessed minutely elaborate simulation of a certified copy of a decree of the court is incapable of a rational and innocent explanation. His testimony, evasive and shifty in many particulars, makes a most unfavorable impression.    We are of the opinion that it would not be safe to permit him to remain in the profession whose duties and obligations he has violated.    The manufacture and delivery of a paper purporting to be a certified copy of a judgment of the Supreme Court is a most serious offense.

The respondent should be disbarred.

LAUGHLIN, DOWLING, PAGE and MERRELL, JJ., concur.

Respondent disbarred.    Settle order on notice.